Young Walgenkim OSB No. 124900
**Hanson & Walgenkim, LLC**
838 Commercial St NE
Salem, OR 97301
Tel. (503) 383-1496 || Fax (503) 766-6477
young@hansonwalgenkim.com

Daniel E. Gustafson
Daniel C. Hedlund
Joseph C. Bourne
Eric S. Taubel
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
jbourne@gustafsongluek.com
etaubel@gustafsongluek.com

Attorneys for Plaintiffs

### UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| **JOSEPH HENDERSON and MATTHEW MANISKAS, on behalf of themselves and all others similarly situated,** | Case No: 3:18-cv-00413 |
| Plaintiffs, | |
| v. | **CLASS ACTION ALLEGATION COMPLAINT** |
| **INTEL CORPORATION,** | |
| Defendant. | **DEMAND FOR JURY TRIAL** |

Joseph Henderson and Matthew Maniskas ("Plaintiffs"), by their undersigned counsel, for themselves and all others similarly situated, hereby commence this class action suit against Defendant Intel, Inc. ("Intel" or "Defendant"), and allege as follows:

## NATURE OF ACTION

1.      Around January 2, 2018, news began to circulate regarding two serious security vulnerabilities— "Meltdown" and "Spectre" (together, the "Defects"). The Defects are inherent to all Intel Central Processing Units that use the x86-64 architecture ("Intel CPUs" or "Intel 64 CPUs") manufactured by Intel Corporation ("Intel").

2.      The Defects provide a backdoor for third parties and malicious programs to access information on computers that use Intel CPUs, regardless of other sophisticated and otherwise through security measures employed to safeguard that data.

3.      After the Defects were exposed by news media, Intel released patches, i.e., downloadable software fixes designed to eliminate a security vulnerability, for the Defects. At the time of the Meltdown patch's release, software experts estimated that use of the patch would slow down computers anywhere between 5% and 30%.

4.      Intel's patch for Spectre caused catastrophic rebooting, as well as other problems on the computers on which it was installed. Since the Spectre patch release, Intel has backtracked, telling consumers *not* to download the faulty patch.

5.      Intel has failed to offer an effective repair to its customers. Not only do the patches detrimentally affect the performance and the overall functionality of the computers using Intel CPUs, the patches fail to fully address the security vulnerabilities created by the Defects.

6.     Intel knew about the Defects for at least six months before it was forced to disclose them publicly. Nevertheless, Intel continued to manufacture, sell, and distribute CPUs with known defects, without disclosing the issues or offering an effective repair.

7.     This action is brought on behalf of both a proposed Nationwide Class and Minnesota and Pennsylvania Subclasses of individuals who purchased Intel CPUs, either through Intel itself, or through purchase of a device that included the Intel CPU as an integral part.

8.     Plaintiffs and the proposed class of consumers were harmed by Intel's failure to disclose and properly remediate the security vulnerabilities inherent in its CPUs. Plaintiffs seek to represent themselves, a nationwide class of all consumers in the United States, and Minnesota and Pennsylvania Subclasses of all consumers in Minnesota and Pennsylvania who are affected by Intel's actions regarding the Defects.

9.     Plaintiffs bring this lawsuit on behalf of all similarly situated consumers— individuals whose CPUs and sensitive information are at risk as a result of Intel's conduct—and allege that Intel's conduct violates Minnesota and Pennsylvania consumer protection statutes and was tortious under common law principles.

10.     On behalf of themselves and the Classes, Plaintiffs seek actual damages, statutory damages, and equitable and declaratory relief.

## PARTIES

11.     Plaintiff Joseph Henderson is a citizen of Minnesota and resides in Ramsey County. Henderson purchased, owns and uses a MacBook Pro that uses an Intel 64 CPU.

12.     Plaintiff Matthew Maniskas is a citizen of Pennsylvania and resides in York County. Maniskas purchased, owns and uses a computer that uses an Intel 64 CPU.

13. Defendant Intel Corporation., is a Delaware corporation with its headquarters and principal place of business located in Santa Clara, California.

## FACTUAL ALLEGATIONS

14. Intel is one of the world's largest manufacturers of central processing units ("CPUs"). Since at least 2008, Intel has made and sold hundreds of millions of CPUs for the x86-64x architecture that is used on virtually all modern laptop and desktop computers. Intel CPUs are found in nearly all of the world's pre-built laptop and desktop computers from manufacturers including Apple, Dell, Hewlett Packard, and Lenovo.

15. Intel sells its CPUs as separate components to individual enthusiasts and businesses. Additionally, Intel manufactures and sells servers with integrated CPUs.

### The Defects

16. On January 2, 2018, the first public news regarding the Defects broke. The Register, a British technology news and opinion website, identified a "fundamental design flaw in Intel's processor chips" that "allows normal user programs – from database applications to JavaScript in web browsers – to discern to some extent the layout or contents of protected kernel memory areas." [1]

17. Two days later, on January 4, 2018, news of the Defects was widely-reported. The specific vulnerabilities caused by the Defects now had names: "Meltdown" and "Spectre."

18. Both defects allow hackers to take advantage of a CPU performance optimization feature known as speculative execution. Speculative execution is a technique designed to

---

[1] John Leyden & Chris Williams, *Kernel-memory-leaking Intel processor design flaw forces Linux, Windows redesign*, The Register (Jan. 2, 2018 7:29PM), https://www.theregister.co.uk/2018/01/02/intel_cpu_design_flaw/.

improve speed, in which a CPU performs work that may or may not be needed, to prevent delays that would be incurred by doing the work after it is known it is needed.

19.     In order to perform speculative execution, the CPU predicts the execution path of a program based on that program's history. If the speculative execution process "guesses wrong" about which path of a branch is likely to be taken, it is rolled back in a manner that is intended to be invisible to the software.[2]

20.     The use of speculative execution causes the CPU's kernel to be vulnerable. The kernel is vital software in an operating system that plays the middleman between the software operations of a computer and the hardware executing those operations.

21.     The kernel itself is intended to prevent access to privileged memory, including that of the kernel itself, from processes on the device that are considered less-privileged. The overall security of a computer system relies on the kernel protecting memory from user access.

22.     However, due to the Defects, sensitive data that would otherwise be protected by the kernel memory isolation—including passwords, social security numbers, credit card and banking information, photographs, and other highly-sensitive private information—may be accessed by malicious programs and users.

23.     As discussed in more detail below, Intel's deployed patches fail to adequately address the harm of the Defects, and in fact create additional catastrophic problems.

***"Meltdown"***

---

[2] "Branching" is an important primary function of a CPUs. "Internally, the CPU keeps a record of the next instruction to be executed in the *instruction pointer*. Usually, the instruction pointer is incremented to point to the next instruction sequentially; the branch instruction will usually check if a specific register is zero or if a flag is set and, if so, will modify the pointer to a different address. Thus the next instruction to execute will be from a different part of program; this is how loops and decision statements work." Ian Wienand, *Computer Science from the Bottom Up* at 36, https://www.bottomupcs.com/csbu.pdf (last accessed February 6, 2018) (emphasis in original).

24.    "Meltdown" is the nickname for one of the vulnerabilities caused by the Defects. Meltdown "enables an adversary to read memory of other processes or virtual machines in the cloud without any permissions or privileges, affecting millions of customers and virtually every user of a personal computer."[3]

25.    Meltdown exploits side-channel information available on Intel CPUs by allowing hackers or malicious application running code on the CPU to obtain a dump of the entire kernel address space, including any mapped physical memory. According to representatives of the team that aided in uncovering the Defects, "Meltdown breaks the most fundamental isolation between user applications and the operating system. This attack allows a program to access the memory, and thus also the secrets, of other programs and the operating system."[4]

26.    The practical outcome of this vulnerability is so serious that experts have stated the risk in no uncertain terms: "If your computer has a vulnerable processor and runs an unpatched operating system, it is not safe to work with sensitive information without the chance of leaking the information."[5]

27.    In order to fully protect against third parties' exploitation of the Meltdown vulnerability, applications, operating systems, and firmware must be updated to protect against the potential leakage of sensitive information.

28.    Intel went on record promising a firmware update by January 15, 2018 for 90% of the affected processors manufactured in the past five years.[6]

---

[3] Moritz Lipp et al., *Meltdown* 1, https://meltdownattack.com/meltdown.pdf (last accessed Feb. 6, 2018).
[4] Meltdown and Spectre, https://spectreattack.com/ (last visited Feb 6., 2018).
[5] *Id.*
[6] Aaron Souppouris, *Intel will patch all recent chips by the end of January*, Engadget (Jan. 8, 2018), https://www.engadget.com/2018/01/08/intel-meltdown-spectre-flaw-security-patch/.

29.     The patch Intel released to remediate Meltdown—that supposedly fixed the vulnerability—came at a cost to processing speed. Although the degree of the slowdowns varies from computer to computer, the slowdowns are palpable and negatively impact operations of the devices using the Intel CPUs.[7] Users of these CPUs were in turn negatively affected. With the Meltdown patch, consumers' devices using Intel CPUs can no longer meet the performance specifications that were advertised at the time of purchase.

***"Spectre"***

30.     "Spectre" is the nickname for the other type of known vulnerability that encompasses two exploitation techniques described as "bounds check bypass" and "branch target injection." Spectre creates a serious risk to the security of information on computers that use Intel CPUs because:

> Spectre breaks the isolation between different applications. It allows an attacker to trick error-free programs, which follow best practices, into leaking their secrets. In fact, the safety checks of said best practices actually increase the attack surface and may make applications more susceptible to Spectre.
>
> Spectre is harder to exploit than Meltdown, but it is also harder to mitigate.[8]

31.     Compared to the slowdown effects of Intel's patch for Meltdown, the side effects of the Spectre patch are even more disastrous. Implementation of Intel's patch for Spectre results in glitches that suddenly reboot machines and creates technical issues with data loss and corruption that are arguably worse than problem the patch was intended to fix.

---

[7] *E.g.*, Tom Warren, *Epic Games blames Meltdown CPU performance issues for Fortnite downtime*, The Verge (Jan. 6, 2018, 12:51 PM), https://www.theverge.com/2018/1/6/16857878/meltdown-cpu-performance-issues-epic-games-fortnite.
[8] Meltdown and Spectre, https://spectreattack.com/ (last visited Feb 6., 2018).

32.     Initially Intel claimed this reboot problem only affected older Intel Broadwell and Haswell CPUs,[9] but it later came to light that machines with newer CPUs were also similarly affected by the sudden reboots.[10]

33.     By January 22, 2018, Intel abruptly changed course, recommending that customers *not* implement the firmware update in order to avoid reboots and "unpredictable system behavior."[11]

34.     However, not implementing the patch was not a choice for individual users of Windows, as the patch came bundled in Microsoft's own security updates. Intel's patch posed such serious problems that Microsoft issued its own emergency security update that specifically disabled Intel's patch in order to prevent data loss and corruption that could occur as a result of the unpredictable reboots.[12]

35.     Intel, in its Q4 Earnings Report, explicitly recognized and admitted to the problems inherent in its CPUs and in Intel's deployed patches:

> Security vulnerability issues may exist with respect to our processors and other products as well as the operating systems and workloads running on them. Mitigation techniques, including software and firmware updates, may not operate as intended or effectively resolve these vulnerabilities. . . . Security vulnerabilities and/or mitigation techniques, including software and firmware updates, may result in adverse performance, reboots, system instability, data loss or corruption, unpredictable system behavior, or the misappropriation of data by third parties.[13]

[9] Navin Shenoy, *Intel Security Issue Update: Addressing Reboot Issues*, Intel Newsroom (Jan. 11, 2018), https://newsroom.intel.com/news/intel-security-issue-update-addressing-reboot-issues/.

[10] Navin Shenoy, *Firmware Updates and Initial Performance Data for Data Center Systems*, Intel Newsroom (Jan. 17, 2018), https://newsroom.intel.com/news/firmware-updates-and-initial-performance-data-for-data-center-systems/.

[11] Navin Shenoy, *Root Cause of Reboot Issue Identified; Updated Guidance for Customers and Partners*, Intel Newsroom (Jan. 22, 2018), https://newsroom.intel.com/news/root-cause-of-reboot-issue-identified-updated-guidance-for-customers-and-partners/.

[12] *Microsoft Issues Update to Disable Intel's Buggy Spectre Patch*, N.Y. Times (Jan. 29. 2018), https://www.nytimes.com/reuters/2018/01/29/technology/29reuters-cyber-intel-microsoft.html.

[13] News Release, Intel, Intel Reports Fourth-Quarter and Full-Year 2017 Financial Results 6

*Intel's Knowledge of the Defects*

36.    For over six months before widespread media coverage brought Meltdown and Spectre to light, Intel knew about Defects in their CPUs.

37.    On June 1, 2017, Intel received an email from a member of Project Zero, a team of security analysts employed by Google, that alerted Intel to the flaw that would be later dubbed Spectre.[14]

38.    Intel knew, or should have known, of the Defects much earlier than it currently claims. Three separate teams (from Google, Cyberus Technology, and the Graz University of Technology) independently discovered and reported the Defects.[15]

39.    Project Zero's official policy is to give companies 90 days before going public with news regarding security flaws it uncovers. Intel was given over twice this timespan to work out its plans on how to address the Defects.[16]

40.    During this generous time period, Intel CEO Brian Krzanich arranged an automated $24M stock sell-off in October that was executed on November 29, 2017.[17]

---

(Jan. 25, 2018), https://s21.q4cdn.com/600692695/files/doc_financials/2017/Q4/Q4-2017_EarningsRelease_Final_final.pdf.

[14] Russel Brandom, *Keeping Spectre Secret*, The Verge (Jan. 11, 2018, 11:58 AM) https://www.theverge.com/2018/1/11/16878670/meltdown-spectre-disclosure-embargo-google-microsoft-linux.

[15] Brian Krebs, *Scary Chip Flaws Raise Spectre of Meltdown*, Krebs on Security (Jan. 5, 2018), https://krebsonsecurity.com/2018/01/scary-chip-flaws-raise-spectre-of-meltdown/.

[16] Russel Brandom, *Keeping Spectre Secret*, The Verge (Jan. 11, 2018, 11:58 AM), https://www.theverge.com/2018/1/11/16878670/meltdown-spectre-disclosure-embargo-google-microsoft-linux.

[17] Troy Wolverton, *Intel was aware of the chip vulnerability When Its CEO Sold Off $24 Million in Company Stock*, Business Insider (Jan. 3, 2018, 8:30 PM), http://www.businessinsider.com/intel-ceo-krzanich-sold-shares-after-company-was-informed-of-chip-flaw-2018-1.

41.     Intel continued to sell its defective CPUs to consumers, deliberately failing to provide them with any notice that the products they were purchasing were defective and posed substantial security risks.

42.     Intel continues to sell the defective CPUs, despite its recognition of the Defects and the inadequate remedy of the patches for Meltdown and Spectre.

## JURISDICTION AND VENUE

43.     Alternatively, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A).  There is minimal diversity and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

44.     The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a).

45.     Venue is proper in the District of Oregon because Intel has extensive operations in Oregon, regularly transacts business in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, the team that developed the patches for the Defects is based primarily in Portland, Oregon, Intel has asked the Judicial Panel on Multidistrict Litigation to consolidate similar actions in this District, and members of the Nationwide Class reside in this District.

## CLASS ACTION ALLEGATIONS

46.     Plaintiffs incorporate the allegations in each above numbered paragraph.

47.     Plaintiffs bring this action on behalf of themselves and all others similarly situated.

48.     Plaintiffs seek to represent the following Classes, defined *infra*:

**Nationwide Class**

All persons residing in the United States or its territories who, from 2008 to the present, purchased a device that includes an Intel x84-64x CPU.

49.     In the alternative Plaintiffs also bring this action pursuant to Rule 23 on behalf of themselves and the following subclass for class members in Minnesota (the "Minnesota Subclass"):

### Minnesota Subclass

All persons residing in Minnesota who, from 2008 to the present, purchased a device that includes an Intel x84-64x CPU.

50.     In the alternative Plaintiffs also bring this action pursuant to Rule 23 on behalf of themselves and the following subclass for class members in Pennsylvania (the "Pennsylvania Subclass"):

### Pennsylvania Subclass

All persons residing in Pennsylvania who, from 2008 to the present, purchased a device that includes an Intel x84-64x CPU.

51.     Excluded from the Nationwide Class and the State Subclasses ('the Classes") are Intel, any entity or division in which Intel has a controlling interest, and their legal representatives, officers, directors, assigns, and successors and the Judge to whom this case is assigned and the Judge's staff. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

52.     The Classes are so numerous that individual joinder of all its members is impracticable.  While the precise number and identification of class members is unknown to

Plaintiffs at this time and can be ascertained only through appropriate discovery of Intel's records, the Nationwide Class is believed to number in the millions.

53.    This action is brought and may properly be maintained as a class action pursuant to the provisions of Federal Rules of Civil Procedure 23(a)(1)–(4) and 23(b)(1)–(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.  Common questions of fact and law exist as to all class members which predominate over any questions affecting only individual class members.  These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any Class member, include the following:

      a.    Whether the Intel CPUs are defective;

      b.    Whether the Intel CPUs are affected by the Meltdown and Spectre defects;

      c.    Whether Intel made and breached any implied warranties related to the sale of defective CPUs through its failure to resolve the Defects as required by law;

      d.    Whether Intel violated California consumer protection law;

      e.    Whether Intel violated Minnesota consumer protection law;

      f.    Whether Intel violated Pennsylvania consumer protection law;

      g.    Whether Plaintiffs and the Class members suffered damages; and

      h.    Whether Plaintiffs and the Class members are entitled to injunctive, declaratory, and monetary relief as a result of Intel's conduct.

54.    Plaintiffs' claims are typical of the claims of the Class members.  Plaintiffs and other Class members must prove the same facts in order to establish the same claims, described herein, which apply to all Class members.

55.    Plaintiffs are adequate representatives of the Classes because they are members of the Class and their interests do not conflict with the interests of the Classes members they seek to represent.  Plaintiffs have retained counsel competent and experienced in the prosecution of complex class action, data breach, and consumer privacy litigation, and together Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of the Classes.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

56.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class members is impracticable.  Even if every Class member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts, in which individual litigation of thousands of cases (or more) would proceed.  Individual litigation presents a potential for inconsistent or contradictory judgments, the prospect of a race for the courthouse, and an inequitable allocation of recovery among those with equally meritorious claims.  Individual litigation increases the expense and delay to all parties and the court system in resolving the legal and factual issues common to all Class members' claims relating to the Intel Data Breach.  By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

57.    The various claims asserted in this action are additionally or alternatively certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

>    a.    The prosecution of separate actions by millions of individual Class members would create a risk of inconsistent or varying adjudications with respect to

individual Class members, thus establishing incompatible standards of conduct for Defendant;

b.  The prosecution of separate actions by individual Class members would also create the risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class members who are not a party to such adjudications and would substantially impair or impede the ability of such non-party Class members to protect their interests; and

c.  Defendant has acted or refused to act on grounds generally applicable to the entirety of each of the Classes, thereby making appropriate final declaratory and injunctive relief with respect to the Classes as a whole.

<u>**COUNT I**</u>
**Violation of the Consumers Legal Remedies Act,**
**California Civil Code § 1750, *et seq.***
**(Individually and on Behalf of the Nationwide Class)**

58.   Plaintiffs incorporate the allegations in each above numbered paragraph.

59.   The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

60.   The CLRA specifically proscribes "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" Persons are prohibited from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised."  Cal. Civ. Code § 1770(a) (5), (7), (9).

61.    Intel is a "person" under Cal. Civ. Code § 1761(c).

62.    Plaintiffs and Class members are "consumers" as defined by Cal. Civ. Code.
§ 1761(d).

63.    Intel's CPUs are goods as defined by Cal. Civ. Code § 1761(a).

64.    Plaintiffs' and members of the Nationwide Class' purchases of Intel CPUs
constitute "transactions" under California Civil Code § 1761(e).

65.    Intel violated the CLRA by misrepresenting the security and performances of its
CPUs and failing to disclose that a design defect existed that compromised the security and
performance of the CPUs.

66.    Intel violated the CLRA through its representations that its CPUs had
sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they did
not have.

67.    Intel violated the CLRA by representing that its CPUs were of a particular
standard, quality, or grade, when they were in fact of another.

68.    Intel violated the CLRA by advertising its CPUs with intent not to sell them as
advertised.

69.    The Defects were not known to Plaintiffs and other members of the Nationwide
Class, and Intel actively concealed this material fact from Plaintiffs and the members of the
Nationwide Class. Therefore, Intel had a duty to disclose the Defect to the Plaintiffs and
members of the Nationwide Class, but failed to do so.

70.    Intel's deceptive acts and practices alleged herein are likely to deceive, and in fact
did deceive, reasonable members of the public, including Plaintiffs and class members.

71.     As a direct and proximate result of Intel's violations of the CLRA, Plaintiffs and the members of the Nationwide Class suffered injury. Plaintiffs and members of the Nationwide Class are therefore entitled to injunctive relief, costs, attorneys' fees, and other relief deemed proper by the Court.

72.     Pursuant to California Civil Code § 1782(d), Plaintiffs seek an Order enjoining the above-described wrongful acts and practices, and for restitution and disgorgement.

73.     Pursuant to California Civil Code § 1782, on March 8, 2018, Plaintiffs' counsel delivered a notice and demand letter to Intel, attached as **Exhibit A**, demanding, among other things, that Intel repair and/or replace the defect CPUs purchased by Plaintiffs and members of the Nationwide Class.

74.     If Defendant fails to correct, repair, replace, or otherwise rectify its CLRA violations within 30 days, Plaintiffs intend to amend this pleading to add claims for actual, punitive, and statutory damages, as appropriate, as well as claims for costs and attorneys' fees pursuant to California Civil Code §§ 1780(e) and 1021.5.

75.     Pursuant to California Civil Code § 1780(d), Plaintiffs have prepared and attached an affidavit as **Exhibit B** stating facts and showing that this action has been commenced in a county described as a proper place for the trial.

**<u>COUNT II</u>**
**Violation of the Song-Beverly Consumer Warranty Act,**
**California Civil Code § 1790, *et seq.***
**(Individually and Behalf of the Nationwide Class)**

76.     Plaintiffs incorporate the allegations in each above numbered paragraph.

77.     Under the Song-Beverly Consumer Warranty Act, California Civil Code § 1790, *et seq.* (the "Song-Beverly Act"), every sale of consumer goods in the state of California is

accompanied by both a manufacturer's and retail seller's implied warranty that the goods and merchantable and implied warranty of fitness.

78.    Plaintiffs and members of the Nationwide Class who purchased Intel CPUs are "buyers" within the meaning of California Civil Code § 1791(b).

79.    Intel CPUs constitute "consumer goods" within the meaning of California Civil Code § 1791(a).

80.    Intel is a "manufacturer" and "seller" of Intel CPUs within the meaning of California Civil Code § 1791.

81.    Intel impliedly warranted to Plaintiffs and Class members that Intel CPUs were merchantable and fit for the ordinary and particular purposes for which the CPUs are required and used.

82.    Because the Intel CPUs sold to Plaintiffs and Class members were not merchantable and were not fit for the ordinary and particular purposes for which such goods are used due to the Defects, Intel breached its implied warranties.

83.    As a direct and proximate cause of Intel's breach of the Song-Beverly Act, Plaintiffs and Class members sustained damages and other losses in an amount to be determined at trial, entitling them to legal and equitable relief, including compensatory damages, consequential damages, statutory damages, and civil penalties, diminution in value. Plaintiffs and Class members are entitled to costs and attorneys' fees.

### COUNT III
**Violation of the California Unfair Competition Law,**
**California Business and Professions Code § 17200, *et seq.***
**(Individually and on Behalf of the Nationwide Class)**

84.    Plaintiffs incorporate the allegations in each above numbered paragraph.

85.     The California Unfair Competition Law (the "UCL") prohibits any "unlawful, unfair, or fraudulent business act or practices." Cal. Bus. and Prof. Code § 17200

86.     Intel's conduct alleged herein is a "business practice" within the meaning of the UCL.

87.     Intel's conduct was and is in violation of the UCL. Intel's conduct violated the UCL in at least the following ways:

      a.     Knowingly and intentionally concealing from Plaintiffs and Class members the Defects in Intel CPUs;

      b.     Advertising that Intel CPUs were faster and more secure than Intel knew they were in reality;

      c.     Continuing to manufacture and sell CPUs that Intel knew to be defective; and

      d.     Breaching express and implied warranties.

88.     Plaintiffs reserve the right to allege other violations of law by Intel, which constitute additional unlawful business acts or practices in violation of the UCL.

89.     Intel's unlawful business acts and practices that violated the UCL were likely to deceive, and in fact did deceive, members of the public, including Plaintiffs and Class members, who suffered injury in fact and lost money or property as the result of Intel's unlawful business practices.

90.     Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Intel under Cal. Bus. & Prof. Code § 17200.

91.     Plaintiffs request that the Court enter such orders or judgments as may be necessary to enjoin Intel from continuing its unfair, unlawful, and/or deceptive practices and to

restore to Plaintiffs and Class members any money that it acquired by unfair competition, including restitution and/or disgorgement, as provided in Cal. Bus. & Prof. Code §§ 17203 and 3345 and for such other relief set forth below.

## COUNT IV
### Violation of the Magnuson-Moss Warranty Act,
### 15 U.S.C. § 2301, *et seq.*
### (Individually and on Behalf of the Nationwide Class)

92.    Plaintiffs incorporate the allegations in each above numbered paragraph.

93.    Plaintiffs and members of the Nationwide Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

94.    Intel is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4)– (5).

95.    Intel CPUs constitute "consumer products" within the meaning of 15 U.S.C. § 2301(1).

96.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this lawsuit.

97.    Under the Magnuson-Moss Warranty Act, a warrantor who provides a written warranty cannot disclaim implied warranties.

98.    As described herein, Intel breached express warranties it made with regard to the speed and security of its CPUs as well as the implied warranty of merchantability for its CPUs.

99.    Intel's express warranties formed a basis of the bargain that was reached when Plaintiffs and members of the Nationwide Class purchased Intel CPUs. Plaintiffs and members of the Nationwide Class relied on Intel's warranties in purchasing Intel CPUs.

100.    A warranty that Intel CPUs were in merchantable condition and fit for the ordinary purpose for which CPUs are used is implied by law.

101.    Intel CPUs, when sold and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose of CPUs.

102.    As a direct and proximate result of Intel's breach of express and implied warranties, Plaintiffs and members of the Nationwide Class have been damaged in an amount to be proven at trial.

## COUNT V
### Breach of Implied Warranty
### (Individually and on Behalf of the Nationwide Class)

103.    Plaintiffs incorporate the allegations in each above numbered paragraph.

104.    Intel is a "merchant" and Intel CPUs are "goods" under the meaning of the Uniform Commercial Code.

105.    Warranties that each Intel CPU was merchantable and was fit for a particular purpose were implied in the contract of each sale to Plaintiffs and members of the Nationwide Class.

106.    To be considered 'merchantable', Intel's CPUs were required to meet the minimum requirements of passing without objection in the trade under the contract description; be fit for the ordinary purposes for which CPUs are used; and conform to the promises or affirmations of fact made on the container.

107.    Intel breached the implied warranty of merchantability with regard to its CPUs because the CPUs failed to meet the criteria listed above.

108.    Regardless of whether there was privity of contract between Intel and a given Class Member or Plaintiff, Intel's implied warranties extend to Plaintiffs and the other members of the Nationwide Class either directly or as third-party beneficiaries.

109.    Intel's breach of its implied warranty of merchantability directly and proximately caused damages.

## COUNT VI
### Breach of Express Warranty
### (Individually and on Behalf of the Nationwide Class)

110.    Plaintiffs incorporate the allegations in each above numbered paragraph.

111.    Intel is a "merchant" and Intel CPUs are "goods" under the meaning of the Uniform Commercial Code.

112.    Under Section 2-313 of the Uniform Commercial Code, an affirmation of fact, promise, or description made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods will conform to the affirmation, promise, or description.

113.    Intel made explicit representations that its CPUs were of particular speeds. After the deployment of the patches designed to mitigate the risks posed by Meltdown and Spectre, Intel's CPUs no longer match the advertised speed description.

114.    As a direct and proximate cause of Intel's breach of express warranty, Plaintiffs and the members of the Nationwide Class have suffered damages and injury in fact.

## COUNT VII
### Negligence
### (Individually and on Behalf of the Nationwide Class)

115.    Plaintiffs incorporate the allegations in each above numbered paragraph.

116.    Intel owed a duty of care to Plaintiffs and members of the Nationwide Class, arising out of the sensitive nature of the information stored, and out of the foreseeability that a serious defect in the Intel CPU's architecture could have severe ramifications.

117.    Intel also owed a duty of care to Plaintiffs and members of the Nationwide Class to ensure that its CPUs were of the quality and processing power that was represented to consumers and would function as intended and promised.

118.    Intel owed a duty to Plaintiffs and members of the Nationwide Class to implement reasonable security procedures that could uncover major defects—such as Meltdown and Spectre—in a timely manner.

119.    Intel owed a duty to Plaintiffs and members of the Nationwide Class to disclose the material fact that Intel CPUs were defective and not as advertised.

120.    Absent Intel's breach of these duties, Plaintiffs and Class members would not have purchased the defective Intel CPUs, or else would not have paid as much for them.

121.    Intel knew or should have known that the purchase and use of its CPUs would cause damage to Plaintiffs and members of the Nationwide Class, and therefore the damage to Plaintiffs and the members of the Nationwide Class is the proximate, foreseeable result of Intel's breach of its duties.

## COUNT VIII
### Unjust Enrichment
### (Individually and on Behalf of the Nationwide Class)

122.    Plaintiffs incorporate the allegations in each above numbered Paragraph.

123.    This claim is pled in the alternative.

124.    Intel benefited and profited from its deceptive advertising, marketing, and sale of Intel CPUs. It would be inequitable to permit Intel to retain the benefit of those payments, when its wrongful conduct in regard to those services injured Plaintiffs and the Class.

125.    Plaintiffs seek restitution and equitable disgorgement to Plaintiffs and the Class members.

**COUNT IX**
**Violation of Minnesota's Prevention of Consumer Fraud Act**
**Minn. Stat. § 325F.68, *et seq.***
**(On Behalf of the Minnesota Subclass)[18]**

126.    Plaintiffs incorporate the allegations in each above numbered Paragraph.

127.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise[.]" Minn. Stat. § 325F.69, subd. 1.

128.    Intel's CPUs are merchandise as defined in Minnesota Statute § 325F.68, subd. 2.

129.    Intel is a person as defined in Minnesota Statute § 325F.68, subd. 3.

130.    Intel misrepresented the security and speed of its CPUs at times that it knew or should have known of the Defects. Intel's affirmations regarding the security and speed of its CPUs was misleading and deceptive, and induced Plaintiffs to spend more for a CPU that was of a lower-quality than was represented.

131.    The speed and security of Intel CPUs are material facts to Plaintiffs and consumers generally, because it is directly related to the core function and feature of the technology.

---

[18] In the event the Court declines to certify a nationwide class, and instead certifies state subclasses, the Minnesota Subclass assert the same legal theories in Counts I – VIII, in addition to those in Counts IX-XI.

132.    Intel knew or should have known about the falsity of its misrepresentations and the deceptive nature of its omissions, and these omissions and misrepresentations directly, foreseeably, and proximately caused Plaintiffs and the Minnesota Subclass to suffer ascertainable loss.

133.    Members of the Minnesota Subclass were injured by paying more than they would have otherwise paid—and more than Intel would have been able to charge—for the defective Intel CPUs. Furthermore, Intel continues to manufacture, market, and sell its defective CPUs.

134.    Plaintiffs further request that the Court enter such orders or judgments as may be necessary to enjoin Intel from continuing to manufacture, market, and sell its defective CPUs and to restore to Plaintiffs and members of the Minnesota Subclass any money that it acquired by violations of the Minnesota CFA.

135.    The Minnesota Class brings this action under the private attorneys general statute. Minn. Stat. § 8.31, subd. 3a. Intel's unlawful acts and practices complained of herein affect the public interest. As a direct and proximate result of Intel's violations of the Minnesota CFA, Plaintiffs and members of the Minnesota Subclass have suffered injury-in-fact and/or actual damages. Pursuant to Minnesota Statute § 8.31, subd. 3a, Plaintiffs and the Minnesota Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

136.    This action will achieve a public benefit by stopping Intel from further exposing the personal computers and other chip-based personal devices from the security vulnerabilities described herein.

137.    In the alternative, pursuant to Minn. Stat. §§ 325F.69 subd. 1 and 325F.70 subd.

1, Plaintiffs request that this Court enjoin Defendant from engaging in the conduct complained of

herein.

## COUNT X
**Violation of Minnesota's Uniform Deceptive Trade Practices Act**
**Minn. Stat. § 325D.43, *et seq.***
**(On Behalf of the Minnesota Subclass)**

138.    Plaintiffs incorporate the allegations in each above numbered Paragraph.

139.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits

deceptive trade practices, which occur when a person, in the course of business, "(5) represents

that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or

quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or

connection that a person does not have;" "(7) represents that goods or services are of a particular

standard, quality, or grade, or that goods are of a particular style or model, if they are of

another." Minn. Stat. § 325D.44.

140.    By its omissions and misrepresentations regarding the security and speed of its

CPUs, Intel represented that its CPUs had the characteristics and benefits that they did not have.

Intel also represented that its CPUs were of a particular standard, quality, or grade, when in fact

the CPUs were a lower standard, quality, quantity, and grade, and advertised the specifications of

its CPUs with the intent not to sell them as advertised.

141.    Plaintiffs and members of the Minnesota Subclass suffered loss by paying more

than they would otherwise have paid for the Intel CPUs and by receiving CPUs that were slower

less secure than what was promised by Defendants. Furthermore, Intel continues to manufacture,

market, and sell its defective CPUs.

142.    Intel intentionally and knowingly misrepresented material facts regarding its CPUs with intent to mislead Plaintiffs and the Minnesota Subclass. Intel knew or should have known that its conduct violated the Minnesota DTPA.

143.    As alleged above, Intel made material statements about the security and speed of the CPUs that were either false or misleading.

144.    Intel owed Plaintiffs and the Minnesota Subclass a duty to disclose the truth regarding its CPUs security and speed, because:

a.      The details regarding the compromised security of speed of Intel's CPUs and concealment thereof were known only to Intel and its select associates that agreed to keep these details a secret;

b.      Intel knew Plaintiffs and the members of the Minnesota Subclass did not know and could not reasonably discover the CPUs' compromised security and speed; and

c.      Intel made general representations about the qualities of the CPUs, including statements about their performance and security, which were misleading, deceptive, and incomplete without the disclosure of the Defects.

145.    Plaintiffs and members of the Minnesota Subclass have suffered loss by paying more than they otherwise would have for the Intel CPUs and by receiving CPUs of a lower quality than they were promised by Intel. Intel continues to manufacture, market, and sell the defective CPUs.

146.    Pursuant to Minn. Stat. § 8.31 subd. 3a, Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota.

This action will achieve a public benefit. Intel's unlawful acts and practices complained of herein affect the public interest. As a direct and proximate result of Intel's violations of the Minnesota DTPA, Plaintiffs and members of the Minnesota Subclass have suffered injury-in-fact and/or actual damages..

147.    Plaintiffs request that the Court enter such orders or judgments as may be necessary to enjoin Intel from continuing its deceptive practices and to restore to Plaintiffs and members of the Minnesota Subclass any money that it acquired by violations of the Minnesota DTPA.

148.    In the alternative, pursuant to Minn. Stat. § 325D.45, Plaintiffs and the Class are likely to be harmed going forward by the production, distribution and sale of Intel CPUs. Intel only announced the flaw once industry insiders and commentators threatened to reveal the Defects. Absent injunctive relief, the Minnesota Subclass will continue to be harmed.

**COUNT XI**
**Violation of the Minnesota Unlawful Trade Practices Act**
**Minn. Stat. § 325D.09,** *et seq.*
**(On Behalf of the Minnesota Subclass)**

149.    Plaintiffs incorporate the allegations in each above numbered Paragraph.

150.    Minnesota's Unlawful Trade Practices Act (the "Minnesota UTPA") provides "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise." Minn. Stat. § 325D.13.

151.    Intel is a "person" within the meaning of Minn. Stat. § 325D.10.

152.    Intel knowingly misrepresented directly to Plaintiffs and members of the Minnesota Subclass the true quality of their merchandise, through its advertising and sale, by its representations regarding the security and speed of its CPUs. Intel misled Plaintiffs and members

of the Minnesota Subclass into believing they were purchasing CPUs of a higher quality than they actually were, thereby violating Minn. Stat. § 325D.13.

153.    Intel's unlawful acts or practices were likely to and did in fact deceive Plaintiffs and the members of the Minnesota Subclass about the true quality of Intel CPUs regarding their speed and security. Plaintiffs and members of the Minnesota Subclass actually relied on Intel's misrepresentations and omissions alleged herein when choosing to purchase Intel CPUs.

154.    Plaintiffs and Minnesota Subclass members have suffered loss by paying more than they otherwise would have for the Intel CPUs and by receiving CPUs of a lower quality than they were promised by Intel. Intel continues to manufacture, market, and sell the defective CPUs.

155.    Plaintiffs and the Minnesota Subclass, bring this claims pursuant to Minnesota Statute § 8.31, subd. 3a. Plaintiffs and the Minnesota Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota UTPA. Intel's unlawful acts and practices complained of herein affect the public interest. As a direct and proximate result of Intel's violations of the Minnesota UTPA, Plaintiffs and members of the Minnesota Subclass have suffered injury-in-fact and/or actual damages.

156.    Plaintiffs request that the Court enter such orders or judgments as may be necessary to enjoin Intel from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Minnesota Subclass any money that it acquired by violations of the Minnesota UTPA.

157.    In the alternative, Plaintiffs and the Minnesota Subclass seek actual damages and injunctive relief pursuant to Minn. Stat. § 325D.15. Plaintiffs and the Minnesota subclass are likely to be harmed going forward by the production, distribution and sale of Intel CPUs. Intel

only announced the flaw once industry insiders and commentators threatened to reveal the Defects.

<u>COUNT XII</u>
**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 P.S. § 201-1, *et seq.***
**(On Behalf of the Pennsylvania Subclass)[19]**

158.    Plaintiffs incorporate the allegations in each above numbered Paragraph.

159.    Plaintiff Maniskas brings this action on behalf of himself and the Pennsylvania Subclass against Intel.

160.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3.

161.    Intel is a "person" within the meaning of 73 P.S. § 201-1(2).

162.    Intel is engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

163.    In the course of Intel's business, Intel engaged in unfair and deceptive acts or practices in violations of the Pennsylvania UTPA. Intel sold defective CPUs while representing those CPUs as having a particular quality which they did not have. Intel sold these CPUs, knowing they were not as advertised.

164.    Intel intended consumers, including Plaintiffs and Pennsylvania Subclass members, to be the ultimate purchasers of its CPUs. Intel sold the CPUs without disclosure of their true condition, and without disclosure of the severe security Defects, and without disclosure of the detrimental effect that the security patches would have on the processor's performance.

---

[19] In the event the Court declines to certify a nationwide class, and instead certifies state subclasses, the Pennsylvania Subclass assert the same legal theories in Counts I – VIII, in addition to those in Count XII.

165.    Through its actions, Intel knowingly engaged in unlawful trade practices by employing deceptive acts or practices and misrepresenting and omitting material facts about the nature of its CPUs.

166.    The speed and security of Intel's CPUs are material facts to Plaintiffs and consumers generally, because it is directly related to the core function and feature of the technology.

167.    Intel knew or should have known about the falsity of its misrepresentations and the deceptiveness of its omissions, and these omissions and misrepresentations directly, foreseeably, and proximately caused Plaintiffs and the Pennsylvania Subclass to suffer ascertainable loss.

168.    Members of the Pennsylvania Subclass were injured by paying more than they would have otherwise paid—and more than Intel would have been able to charge—for the defective Intel CPUs.

169.    Pursuant to 73 P.S. § 201-9.2, Plaintiffs and the Pennsylvania Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Pennsylvania UTPCPL.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendant as follows:

1.      An Order certifying the Nationwide Class and any appropriate subclasses thereof under the appropriate provisions of Federal Rule of Civil Procedure 23, and appointing Plaintiffs and their counsel to represent the Class;

2.      Declarations that the actions of Defendant, as set out above, are unlawful;

3.      Appropriate injunctive and equitable relief;

4.      Compensatory damages;

5.      Statutory damages;

6.      Restitution and/or disgorgement;

7.      Costs, disbursements, expenses, and attorneys' fees;

8.      Pre- and post-judgment interest, to the extent allowable; and

9.      Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury in this case as to all issues so triable.


Dated: March 9, 2018                                    Respectfully submitted,

                                                        *s/Young Walgenkim*
                                                        Young Walgenkim OSB No. 124900
                                                        **Hanson & Walgenkim, LLC**
                                                        838 Commercial St NE
                                                        Salem, OR 97301
                                                        Tel. (503) 383-1496 || Fax (503) 766-6477
                                                        young@hansonwalgenkim.com

                                                        Daniel E. Gustafson
                                                        Daniel C. Hedlund
                                                        Joseph C. Bourne
                                                        Eric S. Taubel
                                                        **GUSTAFSON GLUEK PLLC**
                                                        Canadian Pacific Plaza
                                                        120 South Sixth Street, Suite 2600
                                                        Minneapolis, MN 55402
                                                        Tel: (612) 333-8844
                                                        Fax: (612) 339-6622
                                                        dgustafson@gustafsongluek.com
                                                        dhedlund@gustafsongluek.com
                                                        jbourne@gustafsongluek.com
                                                        etaubel@gustafsongluek.com

*ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS*